ARBA B. DIKE & NATHANIEL POTTER *v.* WILLIAM H. GREENE.

Upon demurrer to a bill in equity, for want of equity, although every inference of law favorable to the party demurring may be drawn from the facts stated in the bill, no inferences of fact can be drawn from them unfavorable to the right of the plaintiff to relief; and a demurrer upon this ground cannot be maintained, unless it is an absolute, certain, clear proposition, that the bill will be dismissed with costs at the hearing, in any state of the proof appropriate to the allegations of the bill.

Upon a bill for the specific performance of a contract for the purchase of an estate, filed by the vendor, where it appeared that a portion of the consideration was to be received by the vendor in an estate of the purchaser " at an appraisal," if, from the neglect or refusal of the purchaser, or from accident or mistake, there has been a failure to make the appraisal through the joint action of the contracting parties, the court may, through a master, make the appraisal, for the purpose of enforcing the contract at the price appraised.

The fact, that after making such a contract, the parties actually submitted the price of the estate to be taken in part payment to certain persons agreed upon as appraisers, held not to imply, under the circumstances, that the appraisers actually appointed were the only appraisers referred to by the parties in their general words that the estate was to be taken " at an appraisal," although the letter of the purchaser making the proposal, upon which the contract was based, referred to a verbal proposal before made by him; and if such inference from the letter of proposal, the reference in it to a former verbal proposal, and from the subsequent submission, were reasonable, it could not be drawn against the plaintiff, upon demurrer to his bill for want of equity.

Where the contract for the sale of an estate, made by letters of proposal and acceptance, at an agreed price, stipulated that a portion of the price was to be taken in an estate of the purchaser " at an appraisal," and the contracting parties subsequently submitted in writing the appraisal of the last-named estate to certain persons, and concluded their agreement of submission with these words: " the party not abiding the decision of the above gentlemen, or any two of them, shall pay the sum of three hundred dollars to the opposite." Held, upon a bill to enforce the performance of the contract of purchase at the rate for the estate to be taken in payment put upon it by the appraisers, that the above stipulated penalty upon the party who should not abide the appraisal did not render the contract incomplete, or authorize either party, upon payment of the penalty, to withdraw from the same.

Nor is such a right to withdraw from the contract upon payment of the penalty to be implied from the fact, taken in connection with the terms of the submission, that the vendor, in a letter subsequent to the appraisal, said, that he had no objection to a new appraisal, especially when the letter insists upon the purchaser's performing the contract upon the footing of the old appraisal on a day named, and speaks of the new appraisal as " in the mean time " to be made; and if it were reasonable to make such an inference, yet if the construction and obligations of a contract entered into by letters, depend upon a minute examination of the conduct of the parties in exposition of it, the court will not, even in a case of doubt, entertain such a question upon demurrer, but will reserve it for full hearing upon answer and proofs.

Upon a bill to enforce upon the purchaser the taking an estate at the price agreed, he to pay in part for the same with another estate to be taken by the vendor at an appraisal, it appearing that the latter estate was appraised at an undervalue, and that one of the appraisers had contracted with the vendors to take the latter estate off their hands at the appraised price, the court will set aside the old appraisement, and ordered the contract to be enforced upon a new appraisement to be made through a master; notwithstanding it appears, that the objection to the appraiser was known to the purchaser, and he, irritated at what he supposed to be an attempt to overreach him, and mistakenly supposing that by the payment of $300 he might withdraw from the contract, told the appraiser to go on and complete the appraisement, as he should have no further dealings with the vendors.

Where, as in the above contract, the contract of sale is in the nature of an exchange of property, the difference in value to be paid in money by the purchaser, and no time is fixed by the contracting parties for the completion of the purchase, and there is no agreement about the rents and profits of the estates to be exchanged or about interest on the difference of value, the implication is, that until the valuation is made according to the contract, each party is to remain in possession of his estate, and no interest is to be charged upon the difference in value.

And where, in such a case, the appraisal of the estate to be taken in part payment was made through the act of the contracting parties at an undervalue, and under circumstances which induced the court to set it aside and order a new appraisal to be made through a master, as the basis upon which the contract should be enforced, the difference in value, to be paid by the purchaser, was held to draw interest only from the date of the master's report which ascertained it.

BILL IN EQUITY by the vendors to enforce the specific performance of a contract of sale of a house and lot in Broad-street, Providence, by them made with the respondent. The allegations of the bill, which was first tried upon demurrer for want of equity, and the facts of the case, the cause having been

afterwards heard upon the proofs, are so fully set forth in the opinion of the court, that it would be repetition merely to prefix them to the report of the case.

. *Bradley* for the complainants.

*T. A. Jenckes* for the respondent.

Ames, C. J.   This bill is brought by one of the complainants as the sole apparent owner of an house and lot in Broad-street, Providence, the title to which is held by him as security for advances, and by the other complainant as the person alone beneficially interested in the property subject as aforesaid.   The purpose of the bill is, to enforce the specific performance of a contract to purchase, at the price of $20,000, the above house and lot, made by the respondent with the last-described complainant, who, as the bill alleges, in making the contract, acted not merely for himself, but with authority from the other complainant.

A demurrer to the bill for want of equity has been filed by the respondent on several grounds, all of which having been waived at the hearing, with the exception of one, enables us to confine our attention exclusively to that.   As to that point the question will be, whether, upon the allegations of this bill, the demurrer being to its substance, " it is an absolute, certain, clear proposition.that the bill would be dismissed with costs at the hearing " in any state of the proof appropriate to the allegation of the bill, using the often-quoted language of Lord Loughborough, in stating the ground upon which a demurrer questioning the equity of a bill similar, in some respects, to this, must be founded.   See *Brooke* v. *Hewitt,* 3 Ves. 253, 255.   In coming to our conclusion upon this question, it will be recollected that the demurrer, admitting all the facts well pleaded in the bill, admits each statement too precisely as it is made ; and whilst, on the one hand, it allows the party demurring the benefit of every conclusion of law from the facts stated in the bill, on the other hand, it does not allow *him*, or the court, to infer further facts from them in his favor.   In hearing a demurrer, a court of equity does not sit to *ascertain* facts, whether by direct evidence or by deduction or inference, any more than a court of law does, upon a demurrer to a plea, or even upon a demurrer to

evidence. The *bill* ascertains the facts; and its statements of facts, whether well or ill founded, and whether by comparison and inference the court might or might not, if at liberty to make inferences of fact, conclude them all to be true, must, for the occasion, all be taken to be true, so that there be no absolute repugnancy between them, or between them and other facts of which the court is bound to take judicial notice. 1 Danl. Ch. Pl. 601–603, 624; *Cuthbert* v. *Creasy*, cited by Daniel, 1 Danl. Ch. Pl. 624; *Verplanck* v. *Caines*, 1 Johns. Ch. R. 57, 59; *Gibbons & Johnson* v. *Hunter*, 2 H. Blacks. 205, 206, Eyre, C. J.

Premising this, as the rule by which we are bound to construe the bill, we come directly to the question, does it state a case of contract which the court can, in the proper exercise of its jurisdiction, specifically enforce ?

The bill sets forth that the respondent, as the conclusion of a negotiation between him and the complainant Potter for the sale and purchase of the estate described in the bill, wrote and sent to said Potter the following offer to purchase, which was by *him* accepted :—

" Mr. Potter. Dear Sir—I have been unable to see the parties that I would wish to, but cannot trade with you on the terms you propose. I will, however, make you the following offer of $20,000 for your estate, you allowing me cost for my Fountain-street estate, *and take the Aborn-street estate at an appraisal*, as I this morning proposed—

| | |
|---|---|
| Your estate . . . . . . . | $20,000 |
| Less Batty and Fountain-street estate . . | 2,725 |
| | $17,275 |

*My Aborn-street estate at an appraisal.*

Yours, &c., Wm. H. Greene."

By this it will be seen, that the bill states a contract, made between the parties, for the sale and purchase of the estate in question, in such sense as to be capable of enforcement in equity, upon a bill properly framed in other respects for that purpose. The contract alleged ascertains the estate sold by the complainants, as the estate of N. F. Potter, the price for it, as $20,000, and the mode of paying this price; to wit, in the

respondent's estate in Fountain and Batty streets at $2,725, and the balance, $17,275, in the respondent's Aborn-street estate at an appraisal, and in cash. Under such a contract, as this court have had occasion before to consider, if from the neglect or refusal of the other party, accident, or mistake, there has been a failure to appraise by the joint action of the contractors, and thus to make certain the value even of the principal subject of the contract, a court of equity may, through a master, make the appraisal itself, for the purpose of enforcing the sale or purchase at the price thus appraised. *City of Providence* v. *St. John's Lodge*, 2 R. I. Rep. 46; and see *Gaskarth* v. *Lowther*, 12 Ves. 106; *Milnes* v. *Gery*, 14 Ves. 400, 407; *Wilkes* v. *Davis*, 3 Mer. 509; *Morse* v. *Merest*, 6 Mad. 25; *Whitlock* v. *Duffield*, 1 Hoff. Ch. R. 130; and also the case of *Jackson* v. *Jackson*, 19 Eng. L. & Eq. R. 545, 546.

In *Morgan* v. *Milman*, 17 Eng. L. & Eq. R. 210, Lord Cranworth says: " If there is an agreement that the price shall be that which is to be ascertained upon a fair valuation, then the court may interfere," by way of specific performance of the agreement; and in *Jackson* v. *Jackson, supra*, Vice-Chancellor Stuart marks the distinction between the case before him and a class of cases in which the court has refused to interfere, in its being " the essence " of the agreement in question, that the purchaser should take the property at a valuation, and not that the valuation should be ascertained in any particular mode. If this be so where the *principal* subject of the contract is to be sold and purchased at a valuation, much more in the case before us, in which the price of the principal subject is fixed by the contract, and only the value of something to be received in part payment, remains to be fixed by an appraisal. Applying the test proposed by Sir John Stuart, we should say, that " the essence" of the contract stated in the bill was the sale and purchase of the complainant's estate in Broad-street at $20,000, and that the stipulated appraisal of the respondent's estate in Aborn-street, for the purpose of ascertaining the amount of a part payment for the principal thing under the contract, was wholly subsidiary and of minor importance. But without this, no one can read the general terms of the offer, " and take the Aborn-street estate

at an appraisal;" and again at the foot of the note, "my Aborn-street estate at an appraisal," without coming to the conclusion, that the writer of this offer was, or made himself appear to be, indifferent as to the special mode of the appraisal, so that his Aborn-street estate was received in part payment of his contemplated purchase, at a fair appraisal.

There was an attempt, on the part of the counsel for the respondent, to connect the closing words of the letter of proposal, to wit, " and take the Aborn-street estate at an appraisal, *as I proposed this morning*," with the subsequent submission by the parties of the value of the Aborn-street estate to certain persons named therein as appraisers, also set forth in the bill, for the purpose of inferring, that precisely such a form of submission was part of the oral proposition of the morning referred to in the letter, and therefore was to be taken as embraced in and forming a part of the letter of proposal itself. We see no ground for making such an inference, even if we were at liberty to do so, upon demurrer, to this bill; for the words " as I proposed this morning," taken in their connection, much more naturally and properly qualify the substance of the proposition, that is, to purchase the estate upon the terms named, than this last clause of it respecting the appraisal of the Aborn-street estate. The whole note reads, casting out what is not essential to test the meaning of the writer, " I cannot trade with you on the terms which *you* propose, but will upon the terms I now state, *as I this morning proposed*." The mere fact that the parties afterwards, and on the next day, as the bill states, submitted the question of the value of the Aborn-street estate to certain persons as appraisers, certainly supports no such inference ; for, as the agreement provides for an appraisal, and it must be made in *some* mode, that it was made in a particular mode, no more implies that the parties contracted to have the appraisal made in *that* mode than in any other, that matter being left at large in the contract. It is obvious, if the reasoning of the counsel for the respondent upon this point be correct, that in all cases in which land or fixtures are agreed in general terms to be sold at a valuation, if the parties under it attempt, as the agreement supposes, to have the property valued, as they must, if they would

Dike & another *v.* Greene.

have it valued at all, in some *special* mode, the court would, on that account, be cut off from interfering to enforce the contract, because, by inference, the special mode adopted would be construed to be the mode and *only* mode agreed upon in the contract. To adopt such reasoning, would be practically to disavow all the distinctions set up in the numerous decided cases upon this subject, and to hold, that in no case of this sort could a court of equity intervene for the purpose of specific performance, if the parties had subsequently agreed upon a mode of valuation, although that subsequent agreement had failed to effect the purpose of it. Besides, if such an inference were legitimate, what right have the court to draw it on demurrer, looking to the statements of the bill? In the most favorable point of view for the position assumed on the part of the respondent, it would require us to infer from the act of the parties in making, or attempting to make, a valuation in a *certain* mode, that in the oral proposal of the morning, referred to in the written proposal, precisely *that* mode of valuation was proposed as a substantial part of the proposal; and having made that inference of fact, to connect thereby the words "as I proposed this morning" with the agreement of submission itself, as different portions of one and the same proposal. Were this reasoning as sound as it is ingenious, although a jury might draw the inference upon an issue at law made up to be submitted to them, or this court might draw it at the hearing of this cause, we cannot, as we have seen, upon demurrer, draw any inferences of fact whatsoever; but merely, upon the facts as stated in the bill, decide whether this be a contract, in such sense, that sitting as a court of equity, we can enforce it. The bill states no such oral agreement as that supposed, and draws no such inference of fact as that which the argument requires. It proceeds directly, after setting forth that the above proposition of the respondent was accepted by the complainants, to allege, that "on the 21st day of May of the year aforesaid, the said Greene and your orator, N. F. Potter, in his own behalf, and for A. B. Dike, executed the agreement and submission to reference, in writing, in the words and figures following;" and then recites the agreement of submission. This allegation embraces the fact, and the whole fact upon this point,

that we have a right to consider on demurrer, leaving all infer-
ences of fact from it, as to what the oral agreement of the
morning was in regard to making the appraisal, to be drawn, if
legitimate, and they can legitimately affect the construction of
this agreement, at the hearing.

And this brings us to the submission to appraisal of the
Aborn-street estate, upon a term of which, the main ground of
this demurrer turns; the preceding being merely preparatory to
it. That agreement, as set forth in the bill, is as follows:—

"Prov. May 21, '56.

" It is mutually agreed between the parties hereto subscribed,
that we name the following gentlemen as appraisers of my
estate in Aborn-street, under my proposition of 20th inst., viz:
Asa Pierce, Philip Case, W. W. Updike; *the party not abiding
the decision of the above gentlemen, or any two of them, shall pay
the sum of three hundred dollars to the opposite.*

(Signed)                            WM. H. GREENE,
                                         N. F. POTTER."

The bill then goes on to state, in substance, that two of the
appraisers agreed on appraised the Aborn-street estate of the
respondent at $7,000, and delivered their appraisement in writ-
ing to the parties; that the respondent refused to complete the
contract, alleging that the appraisement was unreasonably low;
that on the 5th of June, 1856, the complainant, Potter, addressed
him a note, requesting him to fulfil his contract by the next
Saturday, offering to have his own deed ready at that time, and
in the mean time, if the respondent desired a new appraisement
made of his estate, that he could of course have no objection
to it; that a week after, the respondent replied, offering to com-
plete the contract if the complainants would take his Aborn-
street estate at $9,575, and himself to pay the $300 for not
abiding by the appraisal, provided he should ascertain that the
appraisers had not been practised with; that on the 16th of June
the complainants declined this proposition of the respondent,
insisting upon the fulfilment of the contract; that they after-
wards tendered a deed of the estate sold, requiring deeds of the
Fountain-street and Aborn-street estates of the respondent, the
former at the price agreed on, and the latter at the value ap-

praised, and the sum of $10,275 to make up the price of the Broad-street estate of the complainant at the agreed price of $20,000 ; which being refused by the respondent, on the 8th of July, 1856, the solicitors of the complainants gave notice to the respondent of their instructions to proceed against him for a specific performance of his contract of purchase, and on the 29th of July, 1856, filed this bill.

Now the ground of demurrer to this bill relied upon is, that the contract arising out of the complainants' acceptance of the proposition of the respondent of May 20 being incomplete, be-cause the Aborn-street estate was to be appraised before the cash balance to be paid to the complainants for their estate could be ascertained, the agreement to submit to an appraisal of the 21st of May was contemplated, and was necessary to render the contract complete, so that it might be specifically enforced ; but that however that might be on a bill properly framed to meet such a case, upon *this* bill, which proceeds upon the notion that the value of the Aborn-street estate has been ascertained under the agreement of submission, the relief asked cannot be granted, because, by the true construction of that agreement, either party was to be at liberty to waive the award under it by payment to the other of the sum of $300 ; which right had been exercised by the respondent. The conclusion was, that as the value of the Aborn-street estate had not been ascertained according to the agreement of the parties, the contract was not completed between the parties, so as to be the subject of a bill for specific performance ; or, at all events, could not be enforced upon a bill like this, which, wanting in the averments necessary to a bill to enforce the contract under a master's appraisal, pro-ceeded upon the false notion that the value of the Aborn-street estate, had been finally ascertained, under the contract by the award of the appraisers.

We have already considered, in advance, the first branch of this objection, and our conclusion is, that the contract, as stated in the bill, was complete by the acceptance of the respondent's proposal of May 20th, in such sense, that it was capable of being enforced in equity by a bill containing proper averments, the Aborn-street estate to be valued for that purpose by the

25 *

court, through a master. This conclusion has, too, a strong bearing upon the last branch of the objection urged upon us against the equity of the bill. The best ground upon which it could be insisted that the submission to appraisal is to be construed as giving to either party an election to disavow the award under it upon the payment of $300, is, that since the having of such an award made was essential to the completion of the contract, and so the terms of the submission were of the substance of the contract, it would be much more easy to construe, in consistency with the spirit of the decisions, the submission to an appraisal as giving the election in question, than it would be to hold the contract to be complete in legal obligation, according to the intent of the parties, without any submission, or any appraisal made under it. Upon this last supposition, the submission and appraisal would not be of the *substance* of the contract; which would consist in the agreement to sell and purchase the Broad-street estate for $20,000; the Aborn-street estate to be taken in part-payment, at an appraisal made in some mode. Now, if this were the principal object of the parties to the contract, or, that so far as the Aborn-street estate of the respondent was concerned, that estate should be taken by the complainants at an appraisal, without reference to the mode of appraisal, it would be running counter to the principle of all the decided cases bearing upon this subject, to construe the agreement to submit to an appraisal by particular persons, as an alternative agreement, giving either party the right to get rid of the award by paying to the other the sum of $300. It would be to suppose that the parties intended, in a minor and subsidiary branch of their agreement, to reserve to each other the power indefinitely to delay the attainment of, and thus, it might be practically to defeat, considering the subject of the contract, its principal purpose. This would be the very reverse of judicial reasoning upon such a matter; for the principle upon which the cases turn is, that when once it appears that the main purpose of the parties to a contract is, the sale and purchase of an estate, any sum that is named in it to be paid by either in the event of his neglect or refusal to perform his part of the agreement, is construed as a penalty to insure the perform-

ance of the contract in the option of *the other* party, and not as constituting the agreement an alternative one, in the sense of giving him the option to perform his contract or to forfeit the penalty. 1 Sugd. Vend. 246, bot. page and cases cited, and n. 1. This has been the rule everywhere, from the case of *Howard* v. *Hopkyns*, 2 Atk. 371, decided by Lord Hardwicke in 1742, to the latest reported decision upon the point in Massachusetts, *Dooley* v. *Watson*, 1 Gray, 414, 416, decided by the supreme court of that state in 1854. But it is said that these decisions are all in relation to contracts in which the penalty was affixed to the non-performance of the obligation to convey, and not, as in this, to the obligation to abide by an appraisal, where the execution of the contract must, by its terms, await an appraisal. We apprehend the difference, but hardly, in legal effect, the distinction, in a sense favorable to the case of the respondent. It would be much easier to conceive, looking at the language of the instruments, that the proviso in the articles to convey, to wit, "that if either side should break the agreement he should pay to the other £100," as in *Howard* v. *Hopkyns*, *supra*; or the bonds, with condition to convey, in *Ensign* v. *Kellogg*, 4 Pick. 1, and *Plunkett* v. *The Methodist Episcopal Church in N. Am.* 3 Cush. 561, 566, or the promissory note of the purchaser to pay $100 if he failed to perform his agreement, on the day appointed for its execution, as in *Dooley* v. *Watson*, *supra*, were intended to render those contracts alternative, than to gather the same intent from the language of this submission. But when looking a little further, we find that, in this case, there was an important contract entered into between the parties, by which the respondent was to purchase a dwelling-house, at the price of $20,000, and the complainants were to receive in satisfaction and payment therefor two estates and a large sum of money, all to wait for its execution the appraisement of one of the latter of these estates only, we can hardly suppose, under the long-settled law and well-known practice upon this subject, that the parties intended repeated appraisements, at the option of either, with the expense and indefinite delay attending them. In such a transaction, the stipulated sum might well have been inserted by the parties, according to the reasoning of Lord Hardwicke, in

*Howard* v. *Hopkyns, supra,* that they might be paid thereby, if the appraisement fell through, for the trouble, disappointment, and expense to which either might be put, by the neglect, unfaithfulness, or incapacity to perform, of the other. At all events, looking, as Mr. Justice Story says, " courts of equity, in all cases of this sort," do look, " to the *substance* of the transaction, and the *primary* object of the parties," and finding that this " requires a specific performance," we must " treat this penalty as a mere security for its due performance and attainment." 2 Story's Equity Jurisp. § 715.

Some stress was laid by the counsel for the respondent upon the correspondence between the parties subsequent to the award, which is set forth in the bill, and especially upon the offer of the complainant, Potter, made in his note of the 5th of June to the respondent, of a *new* appraisement, as something he could have no objection to, as indicative of the same intent of the parties, claimed by him to be inferred from the penalty clause of the agreement of submission. We see nothing in this correspondence, on the part of the complainant, Potter, indicative of this intent, nor especially in the offer referred to, coupling it with his expressed desire, in the same note, to close the transaction by the next Saturday, and confining his offer of a new appraisal as one, " in the mean time " to be made. The offer in question, taken in its connection, rather indicates his sense of the fairness of the appraisement already made, and, at all events, his willingness to submit to a new one, if it should occasion no delay in closing the matter by the next Saturday; his occasions requiring, as he states, that he should be " absent the next week."

But however this may be, if the construction of this contract, and the nature of its obligations depend, as this line of argument seems to suppose, upon a minute examination of the conduct of the parties in exposition of it, it is plain, that, to use the expression of Lord Loughborough, in his before-quoted judgment in *Brooks* v. *Hewitt,* we " cannot take it short upon a demurrer, that there is nothing for the court ·to do." Yet in that case he declares, in one place, that "it struck him (me) that there is no perfect contract stated in the bill," and in another, " that this was more a treaty than a complete agree-

ment;" 'yet that, inasmuch as it was "a treaty carried on by
the intervention of an agent, and a correspondence through that
agent, and the nature of the agency, and the communication
had with him, would influence the construction of the letters, it
would be very difficult to force an import upon these circum-
stances without evidence." His conclusion was, that in such a
case, the point that there is no perfect contract stated in the bill
"is not a point for a demurrer," which, he says, "must be a
neat, short, point,—an absolute denial of the title of the plain-
tiff;" and that where there "is a combination of circumstances,"
and the question is, whether, upon the hearing, the court is to
decree upon the bill, or to refuse an interposition, leaving the
parties to law, that can never be a ground of demurrer."

For the above reasons, our conclusion is that this demurrer
cannot be sustained, and that the defendant must answer over.

----

An answer having been filed in this cause, it again came on
to be heard at the March term, 1857, upon the answer and
proofs. The answer, besides taking the ground argued on the
demurrer, that the whole bargain was conditional upon both
parties being satisfied with the appraisal of the respondent's
Aborn-street estate, and that either might retreat from that
appraisal and from the bargain upon payment of the stipulated
$300, complained of the appraisal as unduly low; and in con-
sequence of some supposed unfairness attempted by the plain-
tiffs, to have been merely formal, at the instance of the respond-
ent, under the idea that he had the right to get rid of it and the
bargain altogether, upon submitting to the payment of the $300.
The proof upon this last point is sufficiently stated in the
opinion of the court to indicate the ground of their determina-
tion. The case was argued by *Bradley* for the plaintiffs, and
by *Jenckes & Bartlett* for the defendant.

BY THE COURT. We do not see that the case stated in the
bill is materially affected by the answer and proofs, so far as
the plaintiffs' right to a specific performance of their contract of
sale is concerned. That contract appears to us to have been
an unconditional one, fairly made, and at an agreed price;
and the whole difficulty between the parties seems to have

arisen from the circumstances attending the appraisal of the respondent's Aborn-street estate, which, by the terms of the contract, was to be taken by. the complainant, Potter, in part payment, at an appraisal. Now, without imputing any designed unfairness to either of the complainants in what passed between one of them and one of the appraisers previous to his appointment, which indeed nothing in the proof would justify, it certainly was unfortunate, that, as the appraiser understood, it was agreed between one of the complainants and himself, that he should have the Aborn-street estate of the respondent on a long credit at the appraisal, whatever it might be, when that estate should come into the hands of the complainants. It is true that the appraiser when selected by the respondent promptly informed him of the fact which disqualified him from serving; and consented to serve only at the respondent's solicitation; but it is evident that the respondent was irritated at what seemed to him an attempt to overreach him by tampering with the appraiser that he would be likely to select, and in that spirit, determined to submit to the penalty, upon the payment of which he supposed he had a right to be rid of the whole bargain, and to have no further dealings with the complainants. Under this irritation, for which appearances gave some cause, and the false impression as to his rights, which he evidently entertained, he told the appraiser to go on, though informed by the latter that he should fix no price to the estate, but simply agree to that fixed by his co-appraiser; his idea being that the appraisement was a nominal affair, which he had a right to reject with the bargain by paying the sum of $300, and thus honorably rid himself of the whole transaction. The consequence of all this was, that instead of the judgments of three persons concurring in this appraisal, as the written contract requires, there has been but the judgment of one, and the estate, according to the proof, has been greatly undervalued. In an action at law, perhaps, to recover damages against the defendant for a breach of this contract of sale, he would find it difficult, under the circumstances, to defend himself against the consequences of an appraisal which was rendered ineffectual for its true purpose, by the combined influence of his irritation and

mistake of his legal rights under the contract. Strictly, his request to the appraiser to proceed in the matter, as he did proceed, might be construed into a waiver of all objection to him, although in truth it was rather, as designed, a waiver under a mistake as to right, of the contract itself.

Courts of equity do not, however, deal in this spirit with cases of specific performance, and have in some cases refused to interfere at all from the mere fact that the contract was a hard one and would press heavily upon the defendant. *Wedgwood* v. *Adams*, 6 Beavan, 600; *Talbot* v. *Ford*, 13 Sim. 173; *Pickering* v. *Ely*, 2 N. C. C. 249, 266; Adams Equity, 85. It certainly would be a hardship to compel the respondent to submit to an undervalue of his estate in the performance of his contract, when the appraisal has not been made in the spirit of the contract, though in consequence, it may be, of his own hastiness and misconception of his rights. In the view which we have taken of this case, the appraisal of the Aborn-street estate was merely ancillary to the fulfilment of the main contract, as the means of ascertaining the value at which an agreed portion of the consideration of the sale of the plaintiff's estate was to be taken. If, from the act or refusal of the respondent, it had not been made at all, it could still, as we have before determined, have been made by the court through a master, and the principal contract, to which it was subsidiary merely, have been enforced. So now, that we do not think it equitable to enforce the contract set forth in the bill upon the terms of this appraisal, we see no difficulty in doing so upon condition of the complainants submitting to a new appraisal to be made by the court through a master, and thus compelling the complainants who seek, to do equity.

Let a decree be entered to the effect, that the respondent specifically perform the contract of sale set forth in the bill, the Aborn-street estate to be taken in part consideration, at a value to be ascertained by a master of the court.

---

Upon the coming in and confirmation of the master's report, fixing the value of the respondent's estate on the corner of Aborn and Fountain streets at $8,012.50, a question was made

whether the respondent was bound to pay interest on the difference between the value of the plaintiff's estate and the estate of the respondent, since ascertained, from some former period, or only from the date of the report; both estates having remained in the possession of their respective legal owners.

BY THE COURT. The contract, in this case, is in the nature of a stipulated exchange between the parties of their respective estates, one of the estates of the respondent being by the agreement to be taken at a valuation. No time is fixed by the contract for the completion of the purchase, nor is there any agreement about the rents and profits, or about the interest on any difference of value. The plain implication in such a case is, that until the valuation is made, according to the contract, and the difference in value between the estates to be exchanged is thereby ascertained, as each party is to remain in possession of his property, no interest is to be charged on such difference. There was indeed a valuation made by the arbitrators of the parties, but under such circumstances, and in such a manner, that the court have not deemed it equitable to enforce this contract upon the basis of it, and have ordered a new appraisement of the respondent's estate at the corner of Aborn and Fountain streets to be made through a master. Until the master's report, there was not in fact any ascertained sum which the respondent was bound to pay, or, in default, to pay interest on it, by way of damages for nonpayment. It is indeed argued for the plaintiff, that it was the respondent's fault that a new appraisal was not made, since it was offered and refused. Upon looking into the contract, we find that *it* provides for an appraisal by the parties, with a penalty of $300 upon the party who shall not abide by it, with no positive stipulation as to a new appraisal, and certainly with none to be made within a stipulated period. How long it might have taken to agree upon the arbitrators to make the new appraisal, and how long for them to make it, and whether the speediest mode, after all, in which the appraisal could be made was not the mode in which it has been made, is matter of mere conjecture; the only certain thing being, that it was not made until made under the decree of the court, in such sense, as to be equitably binding upon the respon-

dent. Taking for granted that no interest is to be calculated for the plaintiff on any sum not ascertained, and finding this difficulty, now that it is ascertained, in fixing any point of time when the respondent began to be in default in not paying that sum, under a contract, wholly uncertain as to the time within which it should be performed, we do not see how we can charge interest against the respondent from an earlier period than the date of the master's report. This course, at the same time that it seems to us more in accordance with the nature of the contract between the parties, has the recommendation of simplicity, as it renders unnecessary any account of rents and profits made, or which reasonably might have been made, by either of the parties out of their respective estates, agreed to be exchanged.